**RECEIVED**

MAR 3 1 2010
TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE/OPELOUSAS DIVISION

BUCKHORN PARTNERS, LLC

VERSUS

TAYLORS INTERNATIONAL
SERVICES, INC., AND TAYLORS
INTERNATIONAL SERVICES, LTD.

CIVIL ACTION NO. 09-00238

JUDGE: REBECCA DOHERTY

MAGISTRATE: C. MICHAEL HILL

## MEMORANDUM RULING

Currently pending before the Court is a "Motion to Dismiss Pursuant to Rule 12(B)(1), (5) and (6) of the Federal Rules of Civil Procedure," filed by defendant Taylors International Services, Inc. [Doc. 7] For the following reasons, the motion is DENIED.

### Background

BuckHorn Partners, LLC ("BuckHorn") filed suit against Taylors International Services, Inc. ("Taylors Inc.) and Taylors International Services, Ltd. ("Taylors Ltd.") (collectively "Taylors") alleging that Taylors Inc. and Taylors Ltd. violated a Letter Agreement executed in February 2005 by BuckHorn and Taylors Ltd. Taylors Inc., the only defendant to be served to date, responded by filing a motion to dismiss pursuant to Rule 12(b)(1), (5) and (6) of the Federal Rules of Civil Procedure. Plaintiff's complaint alleges in pertinent part as follows:

4. The Defendants are in breach of an agreement reached with BuckHorn dated February 18, 2005 ("Letter Agreement"), which provided that BuckHorn would be paid a percentage of Taylors Ltd.'s gross income from certain life support activities. That breach continues despite amicable demand.

5. Prior to entering into the Letter Agreement, BuckHorn's members met with

1

John McEwen and Ali of Taylors Ltd. at the Mayflower Hotel in Washington, D.C. in the spring of 2003. During that meeting, Messrs. McEwen and Ali explained that Taylors Ltd. had unsuccessfully tried to obtain business in Iraq. Mr. McEwen stated that the company wanted "to get into Iraq." As a consequence, he stated that BuckHorn would be paid a commission for any business obtained in Iraq, even if BuckHorn did not directly introduce the business. These discussions became the foundation of the Letter Agreement described in ¶ 12 below.

6. On July 18, 2003, Ali e-mailed a document to the two BuckHorn members entitled "Taylors Company Profile." The profile stated that the Taylors International Services Group included a North American subsidiary, Taylors Inc., in Lafayette, Louisiana.

7. The members of BuckHorn and Messrs. McEwen and Ali also discussed in 2003 that a cornerstone of any future agreement between BuckHorn and Taylors Ltd. was for BuckHorn to use its existing relationship with Sallyport Global Holdings Inc. ("Sallyport") to assist Taylors Ltd. in obtaining business in Iraq and elsewhere. Sallyport was already conducting significant business in Iraq. Sallyport separately agreed that if Taylors Ltd. entered into a consulting agreement with BuckHorn it would use its own efforts to find business opportunities for Taylors Ltd. in Iraq.

8. Beginning in August 2004, well in advance of the execution of the Letter Agreement, BuckHorn placed Taylors Ltd. in direct contact with Sallyport and its representatives so that life support business could be developed for Taylors Ltd. in Iraq (and elsewhere) for which BuckHorn would be reasonably compensated. During the same month, BuckHorn and Taylors Ltd. began to exchange drafts of a letter agreement which would formalize their relationship.

9. On October 7, 2004, Jon Murphy ("Murphy"), on behalf of Taylors Group, emailed Roy C. Coffee discussing "Taylors" desire to do business in Iraq. Murphy noted that "[he] was keen to get into Iraq…" and that "[u]ltimately as the director responsible to my Board for operations [the decision to work with BuckHorn] will be mine."

10. Murphy continued to negotiate with BuckHorn on behalf of Taylors Ltd. to enter an agreement (which later became the "Letter Agreement") even though Murphy knew that Taylors Ltd. had been purposely reduced to a non-operating shell company in order to make it judgment proof for the reasons described in ¶¶ 21-22 below.

11. The urgency of reaching an agreement increased on January 27, 2005, when Sallyport sent a request for proposal to Taylors for life support services at its compound in Baghdad, Iraq. Since Sallyport's contractual negotiations with Taylors

envisioned a separate agreement between Taylors Ltd. and BuckHorn, the Letter Agreement had to be finalized before Sallyport and Taylors Ltd. could enter into a formal contractual relationship.

12. As a consequence of the discussions and communications described in ¶¶ 5 and 7-9 above, the Letter Agreement was entered into. A true and accurate copy is attached hereto as Exhibit A. Under the Letter Agreement, Taylors Ltd. engaged BuckHorn as a business development consultant with respect to "[p]otential opportunities in Iraq ... [for Taylors Ltd.] to provide life support services" and for "...dealings with Sallyport Global Holdings." (¶ 1). Pursuant to this Agreement (¶ 2), BuckHorn was to be paid 3% of the gross sales of Taylors Ltd. "related to or arising out of the provision of any life support activities introduced by the consultant in Iraq or any contract with Sallyport." BuckHorn was to be paid within 15 days of Taylors Ltd.'s receipt of any funds for any such service. The Agreement further provided that if any payment due thereunder was not timely made, BuckHorn would also be paid interest at the rate of 18% per annum on any outstanding amount. The Letter Agreement also provided: (a) Taylors Ltd. was to provide BuckHorn with access to records in sufficient detail for determining payments owed to BuckHorn (¶ 3); and (b) in the event of any dispute, the prevailing party will be entitled to its reasonable attorney's fees and expenses (¶ 6). "Prevailing party" was defined under the Agreement as the party which substantially prevailed on the principal issues and dispute.

13. The Letter Agreement was executed on behalf of BuckHorn by its two members, Roy C. Coffee and David M. DiStefano. The Letter Agreement was executed on behalf of Taylors Ltd. by Murphy. The Agreement provided (¶ 9) that the signatories to it represented and warranted that each had the authority and ability to execute the Agreement and bind their respective companies.

14. On February 22, 2005, four days after BuckHorn and Taylors Ltd. executed the Letter Agreement, Murphy submitted a proposal to Sallyport for life support services at the Al Kasik military base in northern Iraq. Murphy's e-mail submission was copied to several individuals including Taylors Inc.'s President and CEO, Butch Darce, Taylors Inc.'s CFO, Jamie Tarpley, and Roy C. Coffee. Murphy listed his title as General Manager of "Taylors Group." The e-mail's disclaimer mentions only "Taylors International," a generic company name. The proposal attached to the e-mail includes an Executive Summary for the generic "Taylors International Services" and notes that:

> ...Taylors International Services (TS) has become a major force worldwide in remote site catering, hotel service management, procurement and camp management offering complete turnkey solutions anywhere in the world. The Company is managed via Regional Offices in...Lafayette USA (North and Central America)...

3

These offices support a further 14 offices and depots around the world.

15. On April 1, 2005, Sallyport and Taylors entered into a Master Services Agreement which called for Taylors to provide life support services for Sallyport's compound in Baghdad. Unbeknownst to BuckHorn, the Taylors entity that entered into the Master Services Agreement was Taylors Inc. not Taylors Ltd.

16. Following the execution of the Letter Agreement, Taylors Ltd. and/or Taylors Inc. have received gross revenues subject to the terms of the Letter Agreement which required payment to BuckHorn of the agreed upon 3% of gross sales. However, Taylors Ltd. and/or Taylors Inc. have failed to pay to BuckHorn any of the required amounts under the Agreement. Accordingly, that amount, together with 18% per annum interest, is due to BuckHorn. While some of the amount due has become known, other revenues have been received, subject to the Letter Agreement, for which the amounts are presently unknown. An accounting of the amounts received has been requested by BuckHorn's counsel but declined.

17. After entering into the Letter Agreement, substantial revenues subject to it were purposely diverted by Taylors Ltd. to Taylors Inc. so as to attempt to avoid paying BuckHorn commissions legitimately owed it. Despite this, Taylors Inc. is obligated to pay BuckHorn amounts due it under the Letter Agreement to the same extent as Taylors Ltd. for the following reasons:

(a) During all pertinent times herein, Taylors Inc. was the "alter ego" of Taylors Ltd. in that the two entities had common ownership, directors, officers, management, business purposes and operations. As an "alter ego," Taylors Inc. is legally obligated to BuckHorn for all amounts otherwise due it by Taylors Ltd. under the Letter Agreement. To the extent that any of these commonalities did not exist, they were the result of an artifice created to create the appearance that Taylors Ltd. and Taylors Inc. were two separate and unrelated entities; and

(b) During all pertinent times herein, Taylors Ltd. was merely an instrumentality or adjunct of Taylors Inc. Together they constituted a single business enterprise.

18. During all pertinent times herein, Taylors Inc. and Taylors Ltd. had common ownership and management despite efforts being made to disguise and conceal this.

19. An organizational chart of Taylors Ltd. for the year 2002 reflected that Taylors Inc. for "Houston" and "Louisiana" was within the larger Taylors Ltd. organization.

4

20. Even after 2002, Taylors Ltd. and Taylors Inc. had common ownership. Taylors Inc. is a Nevada corporation authorized to do business in the State of Louisiana. The Louisiana corporate filings dated December 11, 2003 by Taylors Inc. stated that Taylors Ltd. owned all of its outstanding shares. This filing was made by Ali as the Managing Director of Taylors Inc.

21. No later than early 2004, Taylors Ltd.'s principals became concerned that Exxon, as well as the Government of Chad, would assert claims against Taylors Ltd. due to its operations in Chad. Thereafter, steps were taken to make Taylors Ltd. judgment proof.

22. Murphy sent a lengthy e-mail to Ali on March 28, 2004 which addressed actual and potential claims by Exxon and the Chad Government against Taylors Ltd. The e-mail stated, in pertinent part:

> In a worst case scenario is there anyway that we can protect TSS from its association with TIS by either transferring ownership to TTS or organising a paperwork management buyout so that it can't be seen as an asset of TIS…..I'm thinking that if this became a legal wrangle in the end that we could jeopardise our chances with the MOD if TSS was seen to be at risk. We need to discuss this with Sandy and take legal advice. I suppose, it should not be a problem if we protect ourselves, the same would apply to the American business.

Upon information and belief, the referenced "TSS" in this e-mail was to Taylors Support Services; the reference to "TIS" was to Taylors Ltd.; the reference to "Sandy" was to Goodman; and, the reference to "MOD" was to the UK Ministry of Defence.

23. The plan described in the March 28, 2004 e-mail to "protect ourselves" was carried out by the principals of Taylors Ltd. and Taylors Inc. by shifting the majority of the assets of Taylors Ltd. to an off-shore shell entity which, upon information and belief, the principals of Taylors Ltd. and Taylors Inc. owned and controlled. This took place during the summer of 2004. Thereafter, the principals of Taylors Ltd. and Taylors Inc. created the appearance that Taylors Ltd. continued to be a viable and operating company. However, according to the plan, the assets and ongoing business activities of Taylors Ltd. were shifted to Taylors Inc. so as to avoid assets being available within Taylors Ltd. to satisfy the claims of Exxon and the Chad Government. None of this was disclosed to the principals of BuckHorn in their negotiations and discussions leading to the Letter Agreement.

24. The plan to "protect ourselves" was carried out. A Directors' meeting of Taylors Ltd. was held on April 27, 2004. It was attended by Goodman (as Chair) and Ali. According to the minutes of that meeting, it was resolved that an agreement be

entered into between Taylors Ltd. and Trellech Limited for the sale of the shares held by Taylors Ltd. in five other related Taylors' entities. The total consideration to be paid was $5.00 (apparently, $1.00 for each entity). The minutes stated that, under the terms of this sale, Trellech Limited would acquire the ". . . entire issued share capital of Taylors International Services, Inc. . . ."

25. Trellech Limited itself had a direct corporate relationship with Taylors Ltd. further evidencing that the sale of the Taylors entities was not an arm's length relationship despite efforts made to create that appearance. Trellech Limited itself was identified in a corporate filing made by Taylors Ltd. in the United Kingdom as being within the "corporate structure" of Taylors Ltd. as of December 31, 2004. Trellech Limited's financial interest in Taylors Ltd. continued through the date of execution of the Letter Agreement. A Taylors Inc. public filing in Louisiana dated August 18, 2006 stated that Trellech Limited had an ownership interest of 5% or more in Taylors Inc. The United Kingdom Public Record for Taylors Ltd. stated that as of October 13, 2006, the outstanding stock of Taylors Ltd. was owned by Ali and jointly by Goodman and Anne Goodman.

26. Implementing the plan adopted at the Taylors Ltd. April 27, 2004 Board meeting, on July 5, 2004, Taylors Ltd., Trellech Limited, Goodman and others entered into an agreement titled "Share Sale and Loan Novation" ["Share Sale"]. The Share Sale called for the sale by Taylors Ltd. of all the outstanding capital stock in Taylors Inc. to Trellech Limited together with the purchase of outstanding shares of stock held by Taylors Ltd. in four other Taylors-related entities. Trellech Limited, without consideration, also assumed that the payment obligation for $3,182,000 in aggregate debt owed by Taylors Ltd. The various lenders to Taylors Ltd. agreed to release and discharge Taylors Ltd. from all liability for this indebtedness. The Share Sale lacked substance in that, upon information and belief, Trellech Limited itself had no financial ability to repay this indebtedness. The total consideration paid by Trellech Limited to Taylors Ltd. was $5.00.

27. In an August 3, 2007 e-mail from Goodman to Toynton, Goodman represented that the ". . . sale of the T.I.S. Ltd companies to Trellech was an arm's length transaction." This statement was inaccurate. Instead, the sale by Taylors Ltd. to Trellech Limited was part of a prearranged plan between commonly controlled and owned entities to reduce or possibly eliminate the financial exposure which Taylors Ltd. had to the Exxon and Chad Government claims. Toynton, by e-mail dated August 3, 2007, stated that the transaction between (between Taylors Ltd. and Trellech Limited) would be considered to be "a related party transaction."

28. By e-mail dated July 25, 2007 from Toynton to Ali, Toynton asked: "Who manages Taylors Louisiana [Taylors Inc.] & do you know if it still controlled by Mr. Goodman through being owned by Trellech Limited?" Ali responded: "TIS Inc is controlled by Trellech Ltd., managed by Mr. GT Darce, the President and Mr. Jamie

Tarpley, the Vice President Finance. Mr. Goodman is the Chairman. He does not control the company." (emphasis supplied).

29. Ali's statement that Taylors Inc. was controlled by Trellech Limited, was contrary to written representation made by the counsel for Taylors Inc., sent in response to the position expressed by BuckHorn's counsel that Taylors Inc. was obligated to pay BuckHorn all amounts owed to BuckHorn under the Letter Agreement. Specifically, Taylors Inc.'s counsel stated in an e-mail dated October 23, 2006: "[Taylors Ltd.] is a separate entity unrelated to its former affiliate Taylors International Services, Inc." Further, in a letter dated December 1, 2006, counsel for Taylors Inc. stated: ". . . please note that Taylors International Services Inc. was sold to a third party on July 5, 2004."

30. These statements were made to create the impression that as of the date of the Letter Agreement, and thereafter, Taylors Ltd. and Taylors Inc. were unrelated to each other. That is inaccurate. The reference to the July 5, 2004 sale was obviously to the agreement of that date between Taylors Ltd., Trellech Limited and others. The sale to a "third party" was to a third party in name only in that, as set forth above, the "sale" was part of a prearranged plan among commonly owned and controlled entities. Further, it is clear that after July 5, 2004 and at least until July 25, 2007, Taylors Inc. continued to be owned and controlled by the same group of individuals who owned and controlled Taylors Ltd. As stated by Ali in response to Toynton's July 25, 2007 e-mail, Goodman was the Chairman of Taylors Inc. as of that date. During all pertinent times herein, Goodman was a controlling person and shareholder in Taylors Ltd.

31. Goodman held corporate offices in both Taylors Ltd. and Taylors Inc. after July 2004 when the two entities supposedly were unrelated. Goodman appears in the Nevada corporate filings by Taylors Inc. during the 1994-2004 time period as its corporate president. Goodman is listed in the Nevada corporate filing by Taylors Inc. as the Chairman/Director in January 2005 and is thereafter listed as its sole Director in 2005-2006. Goodman is also listed as the Director in the Louisiana corporate filings of Taylors Inc. during the 2001-2005 time period. He also appears as a Director of Taylors Ltd. in United Kingdom filings as of December 31, 2003 and 2004. Goodman is also shown as being the owner of 75% of the outstanding stock of Taylors Ltd. as of December 31, 2003 in United Kingdom filings by Taylors Ltd. Goodman is shown in an October 13, 2006 filing by Taylors Ltd. in England as one of its two shareholders.

32. As further evidence of the defendants' shell game, two different individuals were publicly listed as the President of Taylors at the very same time. Goodman was listed as the President of Taylors Inc. in the Nevada corporate filings during the 2001-2004 time period at the very same time that Mr. Darce is listed as the corporate President in the Louisiana corporate filings.

33. Taylors Ltd. and Taylors Inc. have had overlapping officers and directors as follows:

(a) Ali is listed as the Director and holding the positions of Secretary and Treasurer of Taylors Inc. in Nevada during the 1994-2003 time period. In the Louisiana corporate filings by Taylors Inc., Ali is listed as a Director in a 1996 corporate filing as well as being its Managing Director in a corporate filing dated December 11, 2003. Ali appears in United Kingdom filings by Taylors Ltd. as its Managing Director as of December 31, 2004 as well as the owner of 25% of its outstanding shares as of December 31, 2003. Ali is shown in an October 13, 2006 filing by Taylors Ltd. in the United Kingdom as one of its shareholders;

(b) Murphy executed the Declaration for Taylors Ltd. as a Director/Secretary as of April 23, 2004. Murphy is listed as an owner of 5% or more of the stock of Taylors Inc. as of August 18, 2006 in its Louisiana corporate filing. As previously stated, Murphy signed the Letter Agreement on behalf of Taylors Ltd. Murphy is currently listed on the website of Taylors Inc. as its Vice President and Chief Operating Officer.

33A. Further evidence that Taylors Inc. and Taylors Ltd. are a single business entity is that the Taylors group of companies, including Taylors Ltd. and Taylors Inc., upon information and belief, lacked a defined corporate structure and accurate financial statements, that Taylors Inc. and Taylors Ltd. have intermingled financial resources on several occasions, and that employees of Taylors Inc. have rendered services on behalf of Taylors Ltd. without any accounting between the two companies.

34. Within the week following the execution of the Letter Agreement, by email dated February 22, 2005, sent by Murphy to two Sallyport principals with copies to Roy C. Coffee and Jamie Tarpley, reference was made to a proposal by Taylors for the Al Kasik Project. The Case attachments to the email included daily food service information and lengthy information about Taylors' International Services which was described as an international company registered in Alberney, Channel Islands.

35. By email dated September 1, 2005 from Tom Charron of Sallyport to Roy C. Coffee with copies to John DeBlasio (Sallyport) and Jamie Tarpley, Butch Darce and Murphy (all associated with Taylors Ltd.), an "overview document of Sallyport and Taylors" was attached. The stated purpose of this document was for Mr. Coffee's discussions with FEMA. The document, attached to the email, stated on its cover page that its purpose was for post Hurricane Katrina life support services.

36. Less than 45 days after Taylors Ltd. entered into the Letter Agreement, Sallyport entered into a Master Services Agreement (No. HAS111804) effective

April 1, 2005 with Taylors Inc. Those in charge of the Taylors organization deliberately decided to have Taylors Inc., rather then Taylors Ltd., enter into this contract in order to attempt to avoid their obligations to BuckHorn under the Letter Agreement.

37. Sallyport entered into the Master Services Agreement understanding that it fell under the Letter Agreement so that BuckHorn would be entitled to be paid its contractual fees paid to Taylors Inc. from the Master Services Agreement. This agreement called for Sallyport to place orders for services to be performed by Taylors Inc. under separate Statements of Work or Proposals. The term of the agreement was for one year from the effective date (unless properly terminated earlier). The Master Services Agreement further provided that if there was a Statement of Work for which the parties have obligations that extended beyond this termination date, the terms of the Master Services Agreement were to continue to apply until all obligations under that Statement of Work had been satisfied. The Master Services Agreement also provided that Sallyport was to pay Taylors Inc. a fee of 5% of gross billings related to Life Support and Billable Staff associated with the Life Support Agreement between Sallyport and The Louis Berger Group.

38. All parties to the Master Services Agreement intended that payments by Sallyport to Taylors Inc. of the specified fees were to be subject to the terms of the Letter Agreement. This required Taylors Inc. to pay to BuckHorn 3% of all amounts received by it pursuant to the Master Services Agreement. This was later confirmed by Jamie Tarpley in a telephone conversation with John DeBlasio of Sallyport. In that conversation, Mr. DeBlasio sought and received assurances from Mr. Tarpley, prior to sending to Taylors Inc. a final payment, that all amounts due BuckHorn under the Agreement relating to the Master Services Agreement described in this paragraph and in the sub-contract agreement described in below would be paid. Despite this, no payments were made to BuckHorn.

39. On August 1, 2005, Sallyport and Taylors Inc. entered into a sub-contract agreement related to the Al Basrah Life Support Project. The period of performance was specified to be July 31, 2005 through July 30, 2006. The attached Scope of Work stated that Taylors International Services was to operate food service operations for Sallyport at Al Basrah. The parties to this Agreement intended that payments received by Taylors Inc. pursuant to it were subject to the Letter Agreement which required, in turn, a payment by Taylors Inc. to BuckHorn equivalent to 3% of all revenues received pursuant to this sub-contract agreement. Despite this, no payments were made to BuckHorn.

40. Taylors Inc. and possibly other related entities have entered into contracts and agreements in Iraq and elsewhere subject to the Letter Agreement and its requirement that BuckHorn be paid a consultant's fee of 3% of the gross revenues received. On information and belief, this includes the following contracts for life

support services:

(a) Taylors Inc. and Blackwater USA (later, Blackwater Worldwide) ("Blackwater") entered into a contract for life support services in Iraq. Taylors Inc. obtained this contract only because it had established a presence in Iraq via BuckHorn's introductions and because Blackwater was able to inspect Taylor's operations at the Sallyport/Baghdad project. Blackwater refused to contract with a second company primarily because that company had not established a presence in Iraq;

(b) Taylors Inc. and Target Logistics entered into contracts for life support services in Arizona and in Louisiana after Hurricane Katrina. Taylors Inc. obtained this contract only because it had established a presence in Iraq via BuckHorn's introductions and because Target Logistics was able to inspect Taylor's Sallyport operations in Iraq; and

(c) Taylors Inc. entered into a contract to provide life support services at the Danish Embassy in Baghdad because it had established a presence in Iraq via BuckHorn's introductions.

41. In an effort to avoid the financial obligations owed to BuckHorn pursuant to the Letter Agreement, Taylors Ltd. and Taylors Inc. have wrongfully entered into contracts and other agreements in the name of Taylors Inc. The purpose in doing so has been to avoid the obligations of Taylors Ltd. to BuckHorn under the Letter Agreement.

42. Despite amicable demand, Taylors Inc. claims that it is not bound by the Letter Agreement entered into between BuckHorn and Taylors Ltd., Taylors Inc.'s "alter ego."

[Doc. 21]

## FED. R. CIV. P. 12(b)(1)

Defendant argues "The Petition Should be Dismissed under F.R.C.P. 12(b)(1) [lack of subject-matter jurisdiction] and/or Ordered to be Amended Because It Lacks the Requisite Statement Establishing Jurisdiction." [Doc. 7-2, p.6] Specifically, defendant argues the complaint filed in this matter identifies plaintiff as a limited liability company, but does not set forth the citizenship of each member of the LLC. *See Harvey v. Grey Wolf Drilling Co.*, 542 F.3d 1077 (5th Cir. 2008)(a limited

liability company is a citizen of all of the states of which its members are citizens). Subsequent to

the filing of the motion to dismiss, plaintiff filed an amended complaint, setting forth the citizenship

of each of its members. As it now appears subject matter jurisdiction exists over this matter,

defendant's motion to dismiss premised upon Fed. R. Civ. P. 12(b)(1) is DENIED.

## FED. R. CIV. P. 12(b)(6)

### 1. Standard of Review

As stated in *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007)(citations omitted):

> Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain
> statement of the claim showing that the pleader is entitled to relief." Specific facts
> are not necessary; the statement need only "'give the defendant fair notice of what
> the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*,
> 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). In
> addition, when ruling on a defendant's motion to dismiss, a judge must accept as true
> all of the factual allegations contained in the complaint. *Bell Atlantic Corp., supra*,
> at 555-556.

Additionally, "[m]otions to dismiss under Rule 12(b)(6) 'are viewed with disfavor and are rarely

granted.'" *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009)(quoting *Test Masters*

*Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 570 (5th Cir. 2005)). All reasonable inferences must be

drawn in the plaintiff's favor. *Id.* Finally, "A complaint does not need detailed factual allegations,

but must provide the plaintiff's grounds for entitlement to relief - including factual allegations that

when assumed to be true raise a right to relief above the speculative level. "*Id.* (internal alterations

and quotation marks omitted).

### 2. Analysis

Defendant argues, "Given the Pending Bankruptcy Proceedings of Taylors Ltd., the Petition

Should be Dismissed Because Buckhorn is not the Proper Party to Assert the single Business

Enterprise Theory." [Doc. 7-2, p.7] In support of this argument, defendant relies upon *S.I.*

*Acquisition, Inc. v. Eastway Delivery Service*, 817 F.2d 1142 (5ᵗʰ Cir. 1987) and *In re Schimmelpenninck*, 183 F.3d 347 (5ᵗʰ Cir. 1999), extrapolating from these cases that "alter ego" and "single business enterprise" claims are property of the debtor's estate, and such claims may only be brought by a Trustee or (in this matter) the Liquidator. [Doc. 7-2, pp. 7-13]

As plaintiff correctly points out, both of the cited cases turned upon the laws of the State of Texas pertaining to alter ego and single business enterprise claims. Nothing in the record of this case suggests the laws of the State of Texas will have any bearing in this matter.[1]  Furthermore, the cited cases rely upon federal bankruptcy law, and in *Schimmelpenninck*, the Court specifically relied upon 11 U.S.C. § 304 (repealed in 2005), "which authorize[d] a court to grant injunctive relief against actions seeking to recover property 'involved in' a *foreign* bankruptcy," if and when a debtor filed for an ancillary proceeding in a United States bankruptcy court pursuant to section 304. *Id.* at 351 (emphasis in original).  Nothing in the record before this Court shows or implies that Taylors Ltd. has sought protection pursuant to the bankruptcy laws of the United States, and accordingly, the Court finds those cases are inapplicable to this matter.

Defendant next argues "The Petition Should be Dismissed Because It Fails to Contain Facts Sufficient to Satisfy *Twombly's* Pleading Standards." [Doc. 7-2, p.13] Defendant first notes the letter agreement entered into by plaintiff and Taylors, Ltd. provides for a three percent fee on gross income "'related to or arising out of the provision of any life support activities **introduced by the**

---

[1]Defendant appears to recognize the inapplicability of its cited cases when it states: "The alter ego and single business enterprise causes of action asserted by Buckhorn against Taylors Inc. are 'property of the estate' because nothing in the applicable law, in this case Channel Islands, precludes the assertion of the single business enterprise/alter ego cause of action by the debtor." [Doc. 7-2, p.13] Even were this Court to find United States bankruptcy law had any bearing on this matter, defendant's unsupported, conclusory statement regarding Channel Islands' law would be insufficient to carry its burden of persuasion on a motion to dismiss.

**consultant [Buckhorn]** *[in Iraq]* **or any contract with Sallyport,**'" and that plaintiff is claiming

entitlement to the percentage fee "for contracts Taylors Inc. has or had with the Danish Embassy in

Baghdad, Blackwater in Iraq, and Target Logistics in Arizona and in Louisiana."   [Doc. 7-2, p.13

(bold emphasis in original; italicized portion added)] Defendant then argues:

> However, the complaint contains no factual allegations that Buckhorn
> introduced these contracting parties or in any way assisted Taylors Inc. in obtaining
> the contracts. It also does not contain any factual allegations that such contracts
> arose out of prior contracts with Sallyport. Absent these factual allegations Buckhorn
> offers no facts to show it is entitled to the relief it seeks in this suit. Buckhorn's
> blanket assertion of entitlement to relief, without the requisite factual showing, fails
> to raise a right to relief above the speculative level and is insufficient to satisfy the
> pleading requirements of *Twombly*. The conclusory nature of the allegations requires
> that this claim be dismissed.

[Doc. 7-2, p.14] A review of the amended complaint reveals otherwise. [*See* Doc. 21, ¶¶ 7 ("a

cornerstone of any future agreement between BuckHorn and Taylors Ltd. was for BuckHorn to use

its existing relationship with Sallyport ... to assist Taylors Ltd. in obtaining business in Iraq and

elsewhere"); ¶ 8 (alleging while the letter agreement was being negotiated, "BuckHorn placed

Taylors Ltd. in direct contact with Sallyport ... so that life support business could be developed for

Taylors Ltd. in Iraq (and elsewhere) for which BuckHorn would be reasonably compensated"); ¶ 11

("Sallyport sent a request for proposal to Taylors for life support services at its compound in

Baghdad, Iraq"); ¶ 14 (a Taylors entity submits a proposal to Sallyport for life support services at the

Al Kasik military base in norther Iraq); ¶ 15 (Sallyport and Taylors enter into a Master Services

Agreement for life support services for Sallyport's compound in Baghdad); ¶ 35 (discussions

between Sallyport, BuckHorn and Taylors regarding "discussions with FEMA... for post Hurricane

Katrina life support services"); ¶ 39 (contract between Sallyport and Taylors Inc. "related to the Al

Basrah Life Support Project); ¶ 40(a) (upon information and belief, Taylors Inc. and Blackwater

13

USA entered into a contract for life support services in Iraq; "Taylors Inc. obtained this contract only because it had established a presence in Iraq via BuckHorn's introductions and because Blackwater was able to inspect Taylor's operations at the Sallyport/Baghdad project"); ¶ 40(b) (upon information and belief, Taylors Inc. and Target Logistics entered into contracts for life support services in Arizona and Louisiana, after Hurricane Katrina; "Taylors Inc. obtained this contract only because it had established a presence in Iraq via BuckHorn's introductions and because Target Logistics was able to inspect Taylor's Sallyport operations in Iraq"); ¶ 40(c) (upon information and belief, "Taylors Inc. entered into a contract to provide life support services at the Danish Embassy in Baghdad because it had established a presence in Iraq via BuckHorn's introductions")][2]

---

[2]While not germane to the issue at hand - *i.e.* whether plaintiff has pled sufficient facts to survive a motion to dismiss - the Court notes defendant states in a footnote:

> Entitlement to the percentage fee on the five (5%) percent gross billings paid by Sallyport relative to two other contracts is also claimed. (R. Doc 1, at ¶¶ 37 and 39). As previously discussed, Taylors Inc. has previously offered payment under these two contracts because it stepped in and performed the contracts on behalf of an assignment from Taylors Ltd., which offer was refused.

[Doc. 7-2, p.13, n.11] This appears to be a disputed, material fact. In its opposition memorandum, plaintiff notes defendant admits two of the contracts at issue are subject to the letter agreement when it states, "'The U.S. Aid/Baghdad contract and the Al Basra Life Support contract were obtained by Taylors Ltd. from Sallyport in, respectively August 2005 and March 2006, and are admittedly subject to the Letter Agreement.'" [Doc. 14, p.10, n.23 (quoting Doc. 7-2, p.4)] However, as to defendant's claim it has "offered payment under these two contracts," plaintiff states as follows:

> After admitting that two contracts, Baghdad and Al Basra, are subject to the Letter Agreement, Taylors Inc. makes several factually inaccurate statements about its involvement with those contracts and its offers to, "in good faith," pay the three percent fee due under the Letter Agreement....
>
> Taylors Inc. also claims on three separate occasions that it offered to pay all monies due BuckHorn on the two contracts. Taylor Inc. alleges that it "...has offered and continues to offer to pay BuckHorn the three (3%) fee in connection with [the two] contracts, which offer has been refused." Rec. Doc. 7-2, p. 4. See also p. 2, n. 3; p. 13, n. 11. This claim is also factually inaccurate. Taylors Inc. has never offered to pay the full three percent fee on the two contracts which BuckHorn believes total $3,000,000 in gross

Defendant next argues, "The Petition Should be Dismissed Because the Contracts from which Buckhorn Claims Entitlement to a Percentage Fee are Not Within the Scope of the Letter Agreement," as "the contracts from which it [BuckHorn] claims a percentage fee do not relate to or arise from life support activities 'introduced by' Buckhorn or contracts with Sallyport." [Doc. 7-2, p.14] Specifically, defendant argues: "Buckhorn is Not the Procuring Cause of the Contracts"; "Buckhorn Does Not Have a Vested Interest in the Subsequent Contracts"; and the "Letter Agreement is a Non-Exclusive Agency Agreement." [Id. at 14-17]

The letter agreement at issue in this matter provides, "Company shall pay Consultant an amount equal to three percent (3%) of the gross sales of the Company related to or arising out of the provision of any life support activities introduced by the consultant in Iraq or any contract with Sallyport ('Services')." [Doc. 1-1, p.1] It further describes the services to be provided by BuckHorn as follows: "Company has engaged Consultant as a business development consultant for Company with respect to (I) potential opportunities in Iraq for Company to provide lifte support services; and (ii) dealings with Sallyport Global Holdings ('Sallyport')." [Id.] It additionally defines the "Relationship of Parties" as follows: "It is understood by the parties that Consultant is an independent contractor. Nothing herein is intended to or shall be construed to create a partnership or joint venture between the parties and, except as specifically provided for herein, neither party shall act as agent for the other."

---

payments by Sallyport to Taylors Inc. In fact, Taylor Inc. has refused to provide an accounting or inspection of its business records pursuant to paragraph 3 of the Letter Agreement. R. Doc. 1-2. Taylors Inc. has also refused to pay the interest on any amount outstanding as provided for by paragraph 2 of the Letter Agreement. Finally, Taylors Inc. has never tendered any payment called for by the Letter Agreement.

[Doc. 14, p.10, n.24]

With regard to defendant's argument that BuckHorn was not a "procuring cause" of the contracts, defendant primarily relies upon Louisiana jurisprudence (with one citation to a case from the United States District Court for the District of Columbia[3], and two citations to treatises) addressing brokers, and the requirement, pursuant to Louisiana jurisprudence, that a broker be the "procuring cause" of a sale in order to be entitled to a commission. *See e.g. Dicerson v. Hughes*, 370 So.2d 1301 (La. 3rd Cir. 1979); (citing *Sleet v. Williams*, 291 So.2d 495, 497 (La. 3rd Cir. 1974)("[O]nce a contract of agency is established, the realtor is entitled to his commission, even if the contract is terminated by the seller or has expired by its own terms, if he was the 'procuring cause' in a subsequent sale"). In this matter, the letter agreement specifically states plaintiff is "engaged as a business development consultant," plaintiff is an "independent contractor," and "neither party shall act as agent for the other." The word "broker" is not mentioned in the letter agreement. Typically, a broker is an agent (usually for both parties to a transaction), whereas a consultant is an independent contractor, rather than an agent. *See e.g.* 12 C.J.S. *Brokers* § 9 (2009); *Department of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 10 (2001). Moreover, in this matter, the letter agreement specifically states plaintiff is to serve as a consultant, who is an independent contractor and not an agent. As argued by plaintiff, "Taylors Inc.'s cases and reasoning

---

[3]The contract contains the following clause:

This Agreement shall be governed by the rules of the American Arbitration Association in the event controversies arise and/or claims between the parties hereto and the parties agree to submit any such dispute to arbitration. Judgment on the arbitrator's award is binding and may be entered in any court having jurisdiction. This Agreement is to be *governed by the laws of the District of Columbia **and the parties consent to exclusive jurisdiction in the courts for the District of Columbia***.

[Doc. 1-1, p.2(emphasis added)] The question of jurisdiction in the District of Columbia is not properly before the Court at this time, but the issue is a threshold issue which should be addressed by the parties.

are not relevant, however, because the subject Letter Agreement is nothing like the brokerage

agreements considered in the cited cases. The Letter Agreement is unique, with specific terminology

designed to address specific issues that do not arise in ordinary brokerage agreements." [Doc. 14,

p.11] This Court agrees, in part. Accordingly, the Court finds the cases cited by defendant to be

inapplicable to the issue at hand - *i.e.* whether the contracts at issue were "related to or ar[ose] out

of the provision of any life support activities introduced by the consultant in Iraq or any contract with

Sallyport ('Services')."

As noted, defendant additionally argues plaintiff "does not have a vested interest in

subsequent contracts." Defendant elaborates:

> Case law establishes that merely introducing the parties between whom a
> contract is ultimately formed is not enough to establish "procuring cause." Louisiana
> Courts long ago rejected the position that a broker has a vested interest in a contract
> that would warrant payment of a commission when the contract is later entered into
> without the broker's involvement.

[Doc. 7-2, p.1] As previously noted, the cases cited by defendant discuss "procuring cause" as a

concept related to brokerage contracts; movant has not carried its burden to establish this involves

a brokerage contract. Furthermore, defendant's argument relies upon Louisiana state law and one

case issued by the United States Court of Appeal for the Fourth Circuit. At present, the law

applicable to this contract has not been established, and thus, the Court finds defendant has failed

to carry its initial burden of persuasion. Furthermore, the letter agreement in this matter specifically

states plaintiff is entitled to a commission for "life support activities *introduced by the consultant*...."

Parties are typically free to agree to any terms in a contract, as long as those terms are not in conflict

with public policy, and defendant has failed to carry its burden and demonstrate that a fee based on

"introductions" (as opposed to "procuring cause") is against the public policy *of whatever body of*

17

*law* is ultimately deemed applicable to the Letter Agreement. Moreover, whether the disputed contracts were "introduced by consultant" will likely involve the resolution of material facts, should plaintiff succeed in establishing the doctrine of either "single business enterprise" and/or "alter ego" is applicable in this matter.

In support of its argument that the letter agreement is a non-exclusive agency agreement, defendant complains plaintiff has not carried its "burden of proof... [as] Buckhorn has not included any factual allegations [in its complaint] showing that the contracts ... arose out of introductions made by Buckhorn or from Sallyport contracts." Again, this is a motion to dismiss - not a trial or a motion for summary judgment - and, as previously noted, the Court finds plaintiff has complied with Rule 8(a)(2) and "'give[n] the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Plaintiff need not "prove" it any contracts "arose out of introductions made by Buckhorn or from Sallyport contracts" within its complaint, as that is a matter for trial. Rather, plaintiff must merely give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Twombly* at 555.

Defendant next argues "The Petition Should be Dismissed Because the Letter Agreement is Invalid by Containing an Uncertain and Indeterminable Object." [Doc. 7-2, p.20] Again, **there has been no determination of the law applicable to this contract**, and consequently, the Court finds defendant's three paragraph argument on this allegation (containing two citations to Louisiana cases, and one citation to a District of Columbia case) is wholly insufficient to carry defendant's burden of proof on a motion to dismiss. Until the applicable law is determined, this issue cannot be resolved.

18

Defendant next argues, "In the Event that Any Alleged Breaches Occurred Prior to February 12, 2006, Any Breach of Contract Action is Tolled In Accordance with D.C. St. §12-301." Again, there has been no determination of the law applicable to the Letter Agreement, and consequently, this issue cannot be determined from what is presently before the Court. Moreover, defendant's use of the phrase "in the event that any alleged breaches occurred..." demonstrates this is not a matter for a motion to dismiss, as it will require a factual determination of whether any alleged breaches occurred. For the same reason, defendant's next argument - "In the Event that Any of the Contracts for Which Buckhorn Claims Fees Constitute a "Government Contract" Within the Meaning of 41 U.S.C.A. §254, Such Fees Are Invalid as Against Public Policy" - fails, as it, also, necessarily will involve a factual and/or legal resolution, either of which has been properly put before this Court by movant. Moreover, plaintiff argues the letter agreement does not constitute a government contract, thus again foreshadowing necessary factual determinations, and thus, the inappropriateness of the procedural vehicle chosen by movant.

Defendant next argues, "The Petition Should be Dismissed Because Taylors Inc. Is Not a Party to the Contract." Whether or not Taylors Inc. is a signatory to the contract may ultimately be deemed irrelevant, should the Court determine that the doctrine of either "single business enterprise" and/or "alter ego" were to apply in this matter, a question of law not properly addressed.

Defendant next argues, "The Petition Should be Dismissed Because Buckhorn Has Failed to Properly Serve Process on Taylors Ltd., an Indispensable Party, to This Litigation." [Doc. 7-2, p.25] The Court finds defendant's two sentence, conclusory argument is insufficiently supported,

19

such that the Court would dismiss the complaint.[4]  For the same reason, the Court finds defendant's

three sentence, wholly conclusory argument in support of its assertion fraud has been insufficiently

pled, fails to convince this Court the allegations of fraud should be dismissed.[5]

### Conclusion

In light of the foregoing, defendant's motion to dismiss [Doc. 7] is DENIED in its entirety.

Additionally, defendant's motion for hearing [Doc. 13] is DENIED.

Defendant's motion for leave to file a reply memorandum [Doc. 23] is DENIED, as the

proposed reply relies upon and/or references certain bodies of law (*i.e.* bankruptcy cases applying

Texas law, the law of the Channel Islands) which have not, at present, been established as the

applicable law in this matter; it contests numerous factual allegations contained in the complaint,

which is inappropriate on a motion to dismiss; it would require the Court to essentially take judicial

notice of defendant's unsworn rendition of the facts; and it essentially argues plaintiff should be

---

[4]The entirety of defendant's argument on this issue is as follows:

The suit record in this matter shows no effort on Buckhorn's part to serve
process on Taylors Ltd. Taylors Ltd., the signatory to the Letter Agreement, is an
indispensable party to this litigation, and in its absence the matter cannot proceed. Until
such time as Buckhorn's Complaint is properly served on Taylors Ltd., this matter is
subject to a Rule 12(b)(5) Motion for Insufficiency of Service of Process and an
anticipatory Rule 19 Motion for Failure to Join an Indispensable Party.

[Doc. 7-2, p.25]

[5]The entirety of defendant's argument on this issue is as follows:

In its Complaint, Buckhorn refers to "steps taken to make Taylors Ltd. judgment proof" and a
"plan to 'protect'" assets of Taylors Ltd. (See R. doc. 1, at ¶¶ 19, 22-24), which suggests that Buckhorn is
purporting to allege fraudulent conduct by the defendants. However, as to Taylors Inc. itself, Buckhorn
does not provide the requisite specific factual allegations necessitated by F.R.C.P. Rule 9(b) as applied in
Tuchman, supra, 143 Fd.2d at 1068, to cases involving multiple defendants. For this reason, the
allegations purporting to assert fraudulent conduct on the part of Taylors Inc. should be dismissed.

[Doc. 7-2, p.25]

required to set out in detail the facts upon which its claim is based - in other words, implicit in defendant's argument (by the level of detail urged by defendant) is that plaintiff should employ "fact pleading," rather than "notice pleading."

Plaintiff's motion to strike the affidavit of Jaime Tarpley [Doc. 28] is GRANTED, as the affidavit constitutes a matter outside of the pleadings, which is inappropriate on a motion to dismiss.

Defendant's motion for leave to file a supplemental memorandum in support of its motion to dismiss [Doc. 31] is GRANTED.[6]

Plaintiff's motion for leave to file a supplemental memorandum in opposition to the motion to dismiss [Doc. 32], defendant's motion for leave to file a supplemental memorandum in support of its motion to dismiss [Doc. 33], and defendant's motion for leave to file a supplemental and amending motion to dismiss [Doc. 41] are all DENIED as untimely.

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___31___ day of March, 2010.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE

---

[6]Although the supplemental memorandum was filed after close of the briefing period, the Court finds fairness and equity require that it be granted. The supplemental memorandum was filed "solely to reiterate and restate the its [sic] Motion to Dismiss and supporting documents in light of the Amended Complaint filed by Buckhorn Partners, LLC." [Doc. 31-3] As this Court has extensively discussed the amended complaint, the Court finds defendant's supplemental memorandum addressing same to be warranted.

21